**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2011 SEP 28 P 12: 45

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

NANCY T. LINTON,                    *

    Plaintiff                       *

    v.                              *        CIVIL NO.  JKB-10-276

JOHNS HOPKINS UNIVERSITY            *
APPLIED PHYSICS LABORATORY, LLC,
                                    *
    Defendant                       *

  *    *    *    *    *    *    *    *    *    *    *    *

## REDACTED MEMORANDUM

Nancy T. Linton ("Plaintiff") brought this suit against the Johns Hopkins University Applied Physics Laboratory, LLC ("Defendant"), alleging employment discrimination, hostile work environment, and retaliation in violation of The Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and The Maryland Fair Employment Practices Act, MD. CODE ANN., Human Relations § 20-606 ("FEPA").[1] Defendant now moves for summary judgment. The issues have been briefed and no oral argument is required. Local Rule 105.6. For the reasons set forth below, Defendant's Motion for Summary Judgment (ECF No. 37) is GRANTED.

## I.    BACKGROUND[2]

Defendant is a research and development laboratory that develops communications, weapons, and defense systems for federal government sponsors. Plaintiff is an African-

---

[1] Plaintiff cites the FEPA as MD. CODE ANN., Art. 49B § 16. That statute was repealed in 2009 and reenacted as cited above. *See* MD. CODE ANN., Art. 49B § 16 (West 2011); MD. CODE ANN., Human Relations § 20-606 (West 2011).
[2] In order to protect the privacy of certain individuals referenced in the parties' memoranda, the Court has redacted these individuals' full names and replaced them with their initials.

American, female engineer who worked for Defendant from 2005 to 2009. This case concerns Plaintiff's allegations that her supervisor, Debra Hurt, treated her inappropriately because of her race and then retaliated against her when she complained.

Plaintiff and Ms. Hurt first began working together in January of 2007, when Ms. Hurt became Program Manager of a project Plaintiff was working on called CESAS. From their first meeting, Plaintiff took offense at Ms. Hurt's conduct toward her, which she describes as "condescending and belittling." (Pl.'s Opp. 6, ECF No. 47 - SEALED). In late 2007, Plaintiff left CESAS and became Project Manager for a set of projects called CREW/JCREW, which was also under Ms. Hurt's direction. She alleges that during her time with these projects Ms. Hurt made several comments to her that explicitly or implicitly referred to her race and that she continued to treat her in a demeaning, and sometimes physically threatening, manner. The specific allegations are as follows.

First, Plaintiff alleges that on two occasions Ms. Hurt told her she was "so lucky that she is dark because she does not have to wear makeup at all." *Id* at 8. Second, she alleges that Ms. Hurt said to her, "you guys have such happy kids that are full of life and energy," and that she understood "you guys" to refer to Black people. *Id.* Third, Plaintiff alleges that Ms. Hurt stated that her parents were "survivalists," which Plaintiff took to mean that "[Ms. Hurt] was of the Aryan Nation race, one of those Aryan Nation people that go up in the mountains and hate blacks and Jews, and other minorities." *Id*; (Linton Dep. 143:16-21, ECF No. 47, Ex. 21, Paper Only - SEALED). Third, Plaintiff claims that during a work trip in early 2008, Ms. Hurt told her to "sit up straight" and said she was "afraid" of Plaintiff. (Pl.'s Opp. 10). Plaintiff believes that these remarks were prompted by her race. Fourth, on May 27, 2008, Ms. Hurt allegedly asked Plaintiff to attend a meeting that required a "senior loadset developer," and to represent herself as

such, even though Plaintiff's real position was higher than that of a loadset developer. *Id* at 12. Finally, on May 28, 2008, Ms. Hurt allegedly "singled [Plaintiff] out for abusive treatment" during a teleconference with the Marine Corps, "which included staring angrily at her, cutting her off before she could finish her statements and even going so far as to put her hand directly in [Plaintiff's] face several times to attempt to stop her from speaking." *Id*. According to Plaintiff, Ms. Hurt displayed similar behavior at other of their meetings, including "smack[ing]" the table angrily, putting her hand inches away from Plaintiff's face to stop her from speaking, pointing at her, "jump[ing] up" out of her chair suddenly, "lung[ing]" at her, snatching things out of her hands, and "shush[ing]" her. (Linton Dep. 176-184).

After the last of these incidents, on May 28, 2008, Plaintiff approached her line supervisor, Glenn Gealy, to complain about the way Ms. Hurt was treating her. Plaintiff alleges that Mr. Gealy was initially receptive, but became angry when Plaintiff said that she thought Ms. Hurt was treating her badly because she was Black. She alleges that Mr. Gealy told her not to make that accusation again without "strong" proof. (Pl.'s Opp. 12). The following day, Mr. Gealy allegedly informed Plaintiff that he had told Ms. Hurt everything that Plaintiff had said during their meeting.

At the same time, several other employees working on CREW/JCREW were becoming increasingly dissatisfied with Ms. Hurt's management of the projects. On June 5, 2008, a group of these employees, including Plaintiff, met with Mr. Gealy and Ms. Hurt's supervisor, Lou Colangelo, to voice their complaints, which included Ms. Hurt's alleged lack of technical expertise, her methods of decision-making, and her mannerisms and facial expressions. As a result of this meeting, Mr. Colangelo determined that the CREW/JCREW projects should be reorganized. He then worked with other managers, allegedly including Ms. Hurt, to develop a

"Get Well" plan, which involved splitting the two projects, assigning each its own Project Manager, and setting out more clear roles and responsibilities for each employee.

Over July 8th and 9th, 2008, Mr. Colangelo held a two-day meeting to introduce the plan. Plaintiff was assigned to be Project Manager for the CREW project (Marines), while another employee, Mr. Stutler, was assigned to be Project Manager for JCREW (Navy). Mr. Colangelo also described all of the responsibilities that the Project Managers would ultimately be expected to take on, both immediately and over time. After Mr. Colangelo introduced the Get Well Plan, it was Ms. Hurt's job to work out with Plaintiff and Mr. Stutler which responsibilities each of them would take on immediately, and which they would take on later.

Shortly after the meeting, Ms. Hurt had a brief discussion with Mr. Stutler in which they agreed that Mr. Stutler would handle the technical side of the JCREW project while Ms. Hurt would handle the project's business aspects. Plaintiff, however, approached Ms. Hurt and stated that she wanted to immediately take on all of the responsibilities described during the meeting as well as some additional responsibilities that had not been discussed and which she believed Ms. Hurt had "blocked her from performing." (Pl.'s Opp. 16). These included "allocating funding within the project," being "the Primary sponsor point of contact with APL for the project," "ensur[ing] the appropriate staff are assigned to each task," and "[o]btain[ing]" personnel for the project." *Id.* Ms. Hurt agreed at first, but she and Mr. Colangelo later decided that Plaintiff should not take on all the responsibilities at once. Ms. Hurt therefore sent Plaintiff an e-mail stating that they would have to reconsider the issue. According to Defendant, however, Plaintiff refused to have further communication with Ms. Hurt, and Ms. Hurt therefore had to have Mr. Gealy act as a go-between to negotiate Plaintiff's immediate responsibilities.

With the help of Mr. Gealy, Mr. Colangelo, and an HR specialist, Susan Sickinger, Ms. Hurt put together a document entitled "90 Day Project Manager Responsibilities," which listed Plaintiff's immediate responsibilities in a series of bullet points. Ms. Hurt claims that Mr. Gealy then took the document to Plaintiff for her input. According to Defendant, when both Plaintiff and Ms. Hurt agreed on the content of the document, they scheduled a meeting between themselves and Mr. Gealy to discuss it. Plaintiff alleges, however, that when she arrived at the meeting, Ms. Hurt gave her a new copy of the document that was different than what she had agreed to. Plaintiff alleges that a bullet point reading "Manage the day to day aspects of the project ensuring quality work on time and within budget" had been deleted and replaced with one that read "45 Day Challenge: Demonstrate leadership and problem resolutions skills within a shared matrix team," with the sub point "All resources are joint & must be negotiated between projects." (Pl.'s Opp. 17). Plaintiff understood this to mean that Ms. Hurt was putting her on a performance improvement plan to "improve" her leadership skills, and that she would no longer have responsibility for day to day management of the project. Believing that the standards of the 45 Day Challenge were unfairly stacked against her and that she would have little chance of success, Plaintiff resigned from the CREW project, though she offered to stay for two to six months while Defendant searched for a replacement.

The day after she resigned from CREW, Plaintiff complained to Defendant's HR department that Ms. Hurt had violated her civil rights, and on August 4, 2008, she filed a formal complaint of race discrimination with Defendant's EEO Office. In September, while the complaint was pending, Mr. Gealy found a position for Plaintiff on another project, where she would not have to interact with Ms. Hurt. Around the same time, however, Defendant claims that Mr. Gealy heard from several sources that Plaintiff was improperly maintaining contact with

program sponsors and was speaking negatively about the program. In particular, Defendant claims that Mr. Gealy was concerned about a phone call that Plaintiff made to one of the CREW/JCREW sponsors, named [Officer M]. [Officer M] had previously complained to Defendant about "the performance of a Black APL employee during a field test." (Def.'s Mem. 20). Ms. Hurt allegedly told Plaintiff about the complaint, but, not trusting Ms. Hurt's report, Plaintiff called [Officer M] herself to find out what he had actually said. According to Defendant, Mr. Gealy and other managers believed that such conduct was bad for the program as well as Plaintiff's career prospects and therefore decided to counsel her on her conduct. In order to avoid the appearance of retaliation, however, Defendant postponed the counseling until after the EEO Office had concluded its investigation of Plaintiff's complaint.

In October, Plaintiff received her annual performance review from Mr. Gealy, which included an increased rating for "Leadership Capability" because of her work on the CREW/JCREW projects, as well as a $5,000 salary increase. Around the same time, the EEO Office finished its investigation of Plaintiff's complaint and determined that because the experiences Plaintiff complained of were shared by employees of all races, there had been no discrimination.

In early November, Plaintiff contacted the Howard County Office of Human Rights ("HCOHR") to report her allegations of discrimination. Shortly thereafter, on November 19, Mr. Gealy called Plaintiff to a meeting to counsel her regarding her alleged contact with sponsors and negative statements about CREW/JCREW. According to Plaintiff, Mr. Gealy read from a two-page memorandum, telling Plaintiff to "stop complaining and spreading rumors." (Pl.'s Opp. 22). Plaintiff claims that the "clear import" of the meeting was not to counsel her on her contact with sponsors, but to "warn her that now that the internal EEOO investigation was done, [she]

was to move on and no longer complain, or else." (Pl.'s Opp. 22). She also claims that Mr. Gealy was acting on Ms. Hurt's instructions.

On the same day, Plaintiff filed a formal charge of discrimination with HCOHR. Then, in December of 2008, in response to the "counseling" with Mr. Gealy as well as what she perceived as continued "interference" by Ms. Hurt in her affairs, Plaintiff filed a second complaint with the EEO Office, alleging that she was suffering retaliation for filing her first complaint. However, believing that Defendant planned to terminate her, Plaintiff resigned on January 5, 2009, before the EEO Office finished investigating the complaint. Plaintiff alleges that the investigation continued after her resignation and that the investigator found no retaliation.

On November 5, 2009, Plaintiff received a Right to Sue Letter from the EEOC in connection with her complaint with HCOHR. On February 2, 2010, Plaintiff filed this suit, alleging disparate treatment, hostile work environment, and retaliation under Title VII and the Maryland Fair Employment Practices Act. Defendant now moves for summary judgment.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) directs district courts to grant summary judgment if the moving party shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." If the moving party carries this burden, then summary judgment will be denied only if the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). To carry these respective burdens, each party must support its assertions by citing particular parts of materials in the record constituting admissible evidence. Fed. R. Civ. P. 56(c)(1)(A). The court will then assess the merits of the motion, viewing all facts and reasonable

inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III. ANALYSIS[3]

### A. Disparate Treatment

Plaintiff claims that Defendant, via Ms. Hurt, subjected her to disparate treatment by making comments related to her race and by treating her more harshly than white employees. To survive a motion for summary judgment on a claim of race discrimination, a plaintiff must first establish a *prima facie* case by proffering evidence of the following four factors: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) less favorable treatment than similarly situated employees outside the protected class. *See White v. BFI Waste Servs.*, 375 F.3d 288, 295 (4th Cir. 2004). If a plaintiff succeeds in making out a *prima facie* case, then the burden of production shifts to the employer to proffer a legitimate reason for the alleged discriminatory action. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). If the employer carries this burden, then the plaintiff must demonstrate that the employer's proffered reasons were merely a pretext for discrimination. *Id.* If a plaintiff fails either to make a *prima facie* case or to rebut the employer's proffered explanation of its actions, then the employer is entitled to summary judgment.

The parties do not dispute that Plaintiff is a member of a protected class or that her job performance was satisfactory. Defendant contends, however, that Plaintiff cannot show that she suffered an adverse employment action or that she was treated less favorably than any non-

---

[3] The Maryland Court of Appeals has deemed FEPA to be the state law analogue of Title VII, and has noted that Maryland courts "traditionally seek guidance from federal cases in interpreting Maryland's [FEPA]." *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007). This Court has therefore previously applied Title VII case law in adjudicating FEPA claims. *See, e.g., Alexander v. Marriott Intern., Inc.*, No. RWT 09-cv-2402, 2011 WL 1231029 (March 29, 2011); *Meyers v. Carroll Independent Fuel Co.*, No. RDB 09-1633, 2011 WL 43085 (January 06, 2011). The parties in this case have not alerted the Court to any applicable differences between state and federal law with regard to Plaintiff's claims. The Court will therefore apply federal standards to both sets of claims.

protected employee, and that she cannot rebut its legitimate explanation of its conduct. The Court agrees.

## 1. Adverse Employment Actions

Plaintiff alleges that the splitting of the CREW/JCREW projects, the 45 Day Challenge, and the "counseling" with Glenn Gealy were all adverse employment actions. An adverse employment action, for Title VII purposes, is one that has a substantial negative effect on the "terms, conditions, or benefits" of the plaintiff's employment. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal quotation marks and citation omitted). The Court finds that none of the three actions Plaintiff alleges meet this standard.

First, Plaintiff's allegations regarding the split of the CREW/JCREW projects and the 45 Day Challenge show nothing more than a garden variety reassignment. A change in work assignment ordinarily does not constitute an adverse employment action, even if the new assignment is less desirable than the old. *Id* at 376. To be actionable, a plaintiff must show that the reassignment had a "significant detrimental effect," on her "compensation, job title, level of responsibility, or opportunity for promotion." *Id.* Plaintiff argues that she has met this standard because Defendant's decision to split the projects and hire a second Project Manager diminished her level of responsibility and her opportunities for promotion. Specifically, Plaintiff claims that Defendant uses a performance metric called Best Overall Value ("BOAV") as one of its promotion criteria, and that this metric is affected by an employee's level of responsibility. Therefore, she argues, being taken off the JCREW project and losing her responsibility for day-to-day management of the CREW project could have adversely affected her BOAV score, and thus her ability to qualify for promotion.

The Court finds this argument to be entirely speculative. In fact, Plaintiff offers no evidence at all that the reorganization of the CREW/JCREW projects affected (or could have affected) any of her performance metrics. Although she cites the deposition testimony of Ms. Sickinger for support, this testimony provides no support whatsoever for her position. Rather, Ms. Sickinger merely explains that BOAV is a performance metric that is determined annually by an employee's Group Supervisor. (Sickinger Dep. 56-57, ECF No. 47, Ex. 19 – Paper Only – SEALED). She says nothing at all about what effect, if any, an employee's level of responsibility has on the BOAV. In fact, Plaintiff's counsel repeatedly asked Ms. Sickinger how an employee's BOAV was calculated, and Ms. Sickinger responded each time that Defendant used an algorithm, the content of which she did not know. *Id* at 57-60. Plaintiff also cites the deposition testimony of another of Defendant's managers, William LaPlante, who she claims testified that "BOAV score was correlated to experience in the workplace." (Pl.'s Opp. 29). But, again, after reviewing Mr. LaPlante's deposition transcript the Court can find no such statement. *See* (LaPlante Dep. ECF No. 47, Ex. 13 – Paper Only – SEALED).

Even if Plaintiff had adduced evidence of a correlation between responsibility level and BOAV, however, her argument would still be purely academic because both her BOAV and her annual evaluation ratings increased at the end of 2008. (Gealy Reply Aff. ¶ 4, ECF No. 50-4, Ex. 4 - SEALED). Furthermore, Plaintiff does not dispute that she retained her title and job classification and received a $5,000 raise at the end of the year. Under these circumstances, it is impossible to conclude that either the Get Well Plan or the 45 Day Challenge had any serious detrimental effect on Plaintiff's employment. *See James v. Booz-Allen & Hamilton*, 368 F.3d 371, 376-77 (4th Cir. 2004) (affirming district court's finding that Plaintiff's reassignment was not an adverse employment action because he retained his title, pay, and benefits, and received a

raise and a cash bonus, despite his argument that the new position would allow him to bill less than the previous one, which would affect his potential for promotion).

Lastly, Plaintiff claims that her "counseling" with Glenn Gealy was an adverse employment action because it was the first step in a "progressive discipline process." (Pl.'s Opp. 31). She again claims that this assertion is supported by the deposition testimony of Ms. Sickinger and Mr. LaPlante. These witnesses, however, testified only that progressive discipline, as a general matter, begins with verbal counseling. (LaPlante Dep. 128-30, ECF No. 47, Ex. 13 – Paper Only –SEALED); (Sickinger Dep. 129, ECF No. 47, Ex. 19 – Paper Only –SEALED). Neither of them testified that every verbal counseling marks the initiation of a progressive discipline process. *Id.* Mr. LaPlante said nothing at all about the particular counseling between Plaintiff and Glenn Gealy, and Ms. Sickinger testified that Plaintiff's counseling was absolutely *not* a disciplinary measure. *Id.* In fact, Ms. Sickinger testified that she instructed Mr. Gealy not to give Plaintiff a copy of his written notes because she feared doing so would cause Plaintiff to misconstrue the conversation as a form of discipline, which she was eager to avoid. (Sickinger Dep. 129-30).

Plaintiff also claims that Glenn Gealy told Defendant's internal EEO investigator that he had treated Plaintiff the same as he treated another employee, A.W., whom he had verbally counseled and planned to terminate if his performance did not improve. Plaintiff argues that this statement is evidence that her "counseling" with Gealy was the beginning of a progressive discipline process. Plaintiff cites both Gealy's deposition transcript and an e-mail he sent to the EEO investigator, James Parker. These materials, however, simply do not contain anything resembling the statement that Plaintiff attributes to Gealy. In the portion of the deposition testimony that Plaintiff cites, Gealy in fact denies that he intended to begin a formal discipline

11

process with A.W. (Gealy Dep. 98:4-15, ECF No. 47, Ex. 10 – Paper Only – SEALED). In the e-mail to Mr. Parker, Gealy explains that he is providing "summaries of actions or counseling I have taken over the last several (four or so) years dealing with personnel whose performance was not up to par or was 'misdirected'..." (Gealy e-mail to Parker, ECF No. 47-9, Ex. 8 – SEALED). One of the summaries is in regard to A.W. Gealy writes that A.W. had serious performance problems, that he counseled him on these problems and his need to improve, and that he eventually did decide to begin formal discipline, but that A.W. then resigned. Nowhere does he say that he was "treating Plaintiff the same as he had [A.W.]," or anything of the sort, and there is no obvious similarity between A.W.'s conduct and Plaintiff's. On the contrary, out of the several summaries in the e-mail, the one that most closely resembles Plaintiff's situation is that of D.C., who Mr. Gealy implies made improper comments to government sponsors. Rather than taking steps to terminate D.C., Gealy's summary indicates that he simply assigned him to work exclusively in the laboratory and did not allow him to interact with outside organizations. After some time, however, even these restrictions were lifted.

In view of these facts, it is impossible to infer that Gealy's counseling of Plaintiff was an adverse employment action. Indeed, every piece of evidence Plaintiff has adduced evinces the opposite.

## 2.    Less Favorable Treatment

Plaintiff has also failed to show that any similarly situated, non-protected employee received more favorable treatment than she. Indeed, Plaintiff asserts without reservation that employees and sponsors of all races routinely complained of Ms. Hurt's "demeaning and condescending" behavior, and that some even left or threatened to leave the CREW/JCREW projects to avoid further interaction with her. (Pl.'s Opp. 24-26). Plaintiff nevertheless asserts at

various points in her memorandum that Ms. Hurt targeted her specifically. She alleges that "[Ms. Hurt's] actions against [Plaintiff] were particularly focused [and] unrelenting," (*Id* at 2), that "Ms. Hurt was particularly verbally venomous and physically threatening with [Plaintiff]," (*Id* at 8), that "[Ms. Hurt] was particularly calculating, purposeful and physical with [Plaintiff]," (*Id* at 26), and that Ms. Hurt "did not target whites for negative performance actions as she had done with [C.W.][4] and [Plaintiff]," (*Id*). However, Plaintiff offers no concrete evidence to support any of these assertions. Instead, she identifies a single white employee, Mr. Stutler, with whom she claims to have been similarly situated, and argues that he received more favorable treatment than she did because "he was not placed on a 45 day challenge for leadership skills, was not limited to speaking to person [sic] level 04 and below and was not criticized about blindsiding." (*Id* at 33).

First, it is not at all clear to the Court how Mr. Stutler received more favorable treatment than Plaintiff. Plaintiff's entire theory of why the 45 Day Challenge was adverse is that it reduced her level of responsibility and negatively affected her BOAV score. However, by Plaintiff's own admission, Mr. Stutler assumed only part of the available Project Manager responsibilities for the JCREW Project and asked Ms. Hurt to assume the rest. She offers no details of Mr. Stutler's previous responsibility level, or whether his responsibilities increased or decreased because of the "Get Well Plan."

Second, with regard to the specific differences in treatment that Plaintiff alleges, Plaintiff and Mr. Stutler were not similarly situated. To be similarly situated, a plaintiff and a comparator must be "similar in all relevant respects." *Haywood v. Locke* 387 Fed.Appx. 355, 359 (4th Cir. 2010). They must "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances

---

[4] C.W. was a Black technician at APL who Plaintiff claims was unfairly disciplined by Ms. Hurt. *See infra.*

that would distinguish their conduct or the employer's treatment of them for it." *Id* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)). Plaintiff and Defendant agree that Plaintiff demanded to be given more responsibility than Ms. Hurt and Mr. Colangelo wanted to give her, and that they therefore had to negotiate on the matter. The 45 Day Challenge was created by Ms. Hurt, on the advice of Ms. Sickinger, during this negotiation. In contrast, Plaintiff concedes that Mr. Stutler and Ms. Hurt quickly agreed on the duties he would assume, which appear to be less than what Plaintiff was demanding for herself. There is therefore no basis on which to compare Plaintiff to Mr. Stutler with regard to the 45 Day Challenge. With respect to speaking to sponsors, Plaintiff offers no evidence that Mr. Stutler's responsibilities included interacting with government sponsors of any particular level. Indeed, to the extent that contact with sponsors was a business aspect of the project, this would appear to have been one of the responsibilities that Mr. Stutler asked Ms. Hurt to take over. Here again, Plaintiff and Mr. Stutler are not similarly situated. With respect to being criticized for "blindsiding," Plaintiff offers no evidence that she and Mr. Stutler had similar patterns of communication with Ms. Hurt. Ms. Hurt claims that her comment about Plaintiff "blindsiding" her referred to an e-mail that she alleges Plaintiff sent directly to a government sponsor, instead of sending the e-mail through Ms. Hurt, as was standard procedure. Ms. Hurt also claims that Plaintiff refused to communicate with her except by e-mail, making it necessary for Glenn Gealy to act as a go-between. Plaintiff does not deny these allegations and does not claim that Mr. Stutler engaged in similar conduct. There is thus no basis on which to compare Plaintiff and Mr. Stutler with regard to Ms. Hurt's criticism of Plaintiff's communication.

The Court therefore finds that Plaintiff has failed to show that she received less favorable treatment than any similarly situated, non-protected employee.

14

### 3.    Pretext

Even if Plaintiff were able to prove the elements of a *prima facie* case of disparate treatment, her claim would still fail because she has not shown that Defendant's proffered legitimate reasons for its alleged conduct were a pretext for race discrimination.

Defendant claims that its true reason for splitting CREW/JCREW was that the program was growing too quickly and facing too much new demand from military sponsors to be adequately handled by a single manager and that the existing organizational structure was generally inefficient and lacked cohesion. (Def.'s Mem. 13-14, 36). Although Plaintiff insists that Defendant's decision to split the program was a direct response to her complaints and that it "negatively targeted" her, she has offered no evidence whatever to show that the program did not suffer from the organizational maladies Defendant describes, that the program was not growing rapidly, or that adding a second Project Manager to accommodate that growth was not a legitimate business decision. Most importantly, she has not even hinted at any evidence that her race somehow played a role in the decision.

Defendant's proffered reasons for the 45 Day Challenge are "the disagreements between [Plaintiff] and Ms. Hurt over which responsibilities [Plaintiff] would take on" and "the problems Ms. Hurt was having communicating with [Plaintiff]." (Def.'s Mem. 36). Plaintiff argues that this reason is a pretext because Ms. Hurt allegedly offered several inconsistent reasons at her deposition for the Challenge. Plaintiff cites pages 199-203 of Ms. Hurt's deposition transcript as containing the relevant testimony. (Pl.'s Opp. 33).

After reviewing Ms. Hurt's testimony, however, the Court finds nothing inconsistent about her explanation of the 45 Day Challenge. She first states that, with respect to the Get Well Plan, Defendant's HR Department had advised her and Mr. Colangelo that they should have an

"interim goal" so as not to "get to the end of the 90 days and not have any feedback on how things were doing." (Hurt Dep. 192, ECF No. 47, Ex. 15 – Paper Only - SEALED). Later, when Plaintiff's counsel asked Ms. Hurt whether she would have taken Plaintiff off the 45 Day Challenge if she had objected earlier, Ms. Hurt responded that, "the 45-day Challenge was, was not an end of itself. It was just a way to highlight the need for good communication between the Program Manager and the Project Manager." *Id* at 196-97. When asked to whom the bullet was addressed, Ms. Hurt answered that it was addressed to Plaintiff "to say that the lab that is shared by the Team is going to continue being shared by the Team." *Id* at 199. She explained that because the programs were short on staff and other resources, these resources would have to be shared. When asked why a similar bullet was not addressed to Mr. Stutler, Ms. Hurt responded that Mr. Stutler had never asked to have staff or resources carved out exclusively for his side of the project, whereas Plaintiff had. She further explains that, initially, Plaintiff had

> … asked that she be able to pick the members from the members of the overall Team and have them only work on [sic] Marine Corps and only report to her. And then, the resources in the laboratory that were shared would only be Marine Corps resources and, and the Navy wouldn't use them. That there would be a splitting of the Teams and the resources. But the truth was we didn't have enough resources and people that we could form two different labs and two different Teams. We had to share.

*Id* at 200-01. When Plaintiff's counsel asked Ms. Hurt about communication, Ms. Hurt answered that "communication had just about stopped between [Plaintiff] and I." *Id* at 204. When counsel asked why Ms. Hurt had concluded there was a communication problem between her and Plaintiff, she responded, "the fact that [Plaintiff] stopped speaking to me, speaking to me on the telephone, appearing in meetings. Her sole communication was the e-mail, and it was not every e-mail." *Id* at 208.

In sum, Ms. Hurt testified that the 45 Day challenge served three purposes: (1) to provide a measure of progress as the team implemented the Get Well Plan; (2) to emphasize the need for better communication; and (3) to emphasize that scarce resources had to be shared between projects. The Court does not see the alleged inconsistency.

Finally, Defendant's proffered explanation for Plaintiff's "counseling" with Mr. Gealy is that Mr. Gealy "heard from several sources that [Plaintiff] was speaking negatively about the program, and that she had continued contact with program sponsors," and he believed that Plaintiff's conduct was harmful both to the program and to her own career prospects. (Def.'s Mem. 20). Additionally, Mr. Gealy was ordered to conduct the counseling by his supervisor, Mr. Keane. Plaintiff offers no evidence at all that these reasons were pretextual. Instead, she merely asserts that Mr. Gealy did not investigate the accusations before counseling her, and that she did not in fact contact one of the sponsors that she was accused of contacting. She also asserts that it is "unlikely" that Ms. Hurt and other APL managers would have spent "hours of time" arranging for a counseling on two phone calls that allegedly took place months before the counseling, and that such an action would not make sense. (Pl.'s Opp. 36-37). These conclusory arguments fall well short of meeting Plaintiff's burden. Title VII is not concerned with the wisdom of Defendant's proffered reasons, but only with whether they were the *real* reasons. Plaintiff offers no evidence that would allow a reasonable jury to conclude that Mr. Gealy and other managers did not receive complaints that Plaintiff was contacting sponsors and speaking ill of the program, or that they could not have reasonably thought it necessary to stop such conduct. In fact, Plaintiff even admits that she contacted [Officer M] about his complaint, and that he later reported her call to Defendant, noting that it was "not cool." *Id.*

17

### 4. Conclusion

For the foregoing reasons the Court concludes that Plaintiff has neither proven the elements of a *prima facie* case of disparate treatment nor rebutted Defendant's legitimate accounts of the disputed actions. Defendant is therefore entitled to summary judgment on this claim.

### B. Hostile Work Environment

Plaintiff claims that Ms. Hurt's alleged racial comments and physical gestures created a hostile work environment. To succeed on a claim of a racially hostile work environment, a plaintiff must prove that she was subjected to harassment in her workplace that was: (1) unwelcome; (2) based on race; (3) severe or pervasive; and (4) imputable to the employer. *EEOC v. Xerxes Corp.*, 639 F.3d 658, 668-69 (4th Cir. 2011) (internal quotation marks and citation omitted). Defendant concedes that Ms. Hurt's conduct toward Plaintiff was unwelcome, but argues that Plaintiff has failed to show that that conduct was racially motivated, severe or pervasive, or attributable to Defendant. The Court agrees that the conduct Plaintiff describes cannot be plausibly attributed to her race and that it was neither severe nor pervasive.

### 1. Relation to Race

To establish that alleged harassment is motived by a plaintiff's race, the plaintiff must demonstrate that "but for" her race, she would have been treated differently. *See Gilliam v. South Carolina Dept. of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007). Plaintiff attempts to meet this burden by arguing that Ms. Hurt made "race based" comments to her and directed "race neutral actions" at her that she did not direct at white employees. (Pl.'s Opp. 37). The Court assumes that the "race based comments" Plaintiff refers to are the following: (1) that "[Plaintiff] was so lucky that she is dark because she does not have to wear makeup at all"; (2)

that "you guys have such happy kids that are full of life and energy"; (3) that Ms. Hurt's parents were "survivalists"; (4) that Ms. Hurt was "afraid" of Plaintiff; and (5) Ms. Hurt's direction that Plaintiff "sit up straight." Even in the light most favorable to Plaintiff, these statements do not suggest that Ms. Hurt's treatment of Plaintiff was motivated by racial animus. In the first place, only one of the comments (i.e., regarding the color of Plaintiff's skin) clearly relates to Plaintiff's race. If made, the comment was ignorant and insensitive, but by itself does not evidence animosity. As to the other comments, Plaintiff offers no evidence that they relate to race at all; her contention to the contrary is based on speculation and therefore cannot meet the evidentiary standard required at the summary judgment stage. *See Jackson v. Locke*, Action No. 08:10-CV-705-AW, 2011 WL 1231301 at *8 (D. Md. March 29, 2011).

Plaintiff also alleges that Ms. Hurt directed "race neutral actions" at her that she did not direct at white employees. Specifically, Plaintiff states that "Ms. Hurt was demonstrably more physical with [Plaintiff] to the point that [Plaintiff] feared her." (Pl.'s Opp. 38). Plaintiff does not identify what "physical" acts she is referring to, but the Court assumes that she refers to the allegations in her deposition testimony that Ms. Hurt would "smack" the table angrily, put her hand inches away from Plaintiff's face to stop her from speaking, point at her, "jump up" out of her chair suddenly, "lunge" at her, snatch things out of her hands, and "shush" her. (Linton Dep. 176-184). Plaintiff argues that these acts evidence racial animus because Ms. Hurt did not act similarly with white employees. But, again, she offers no evidence at all to support this assertion, and even admits that on at least one occasion Ms. Hurt also put her hand in "D.C.'s" face. Without specific evidentiary support, Plaintiff's bare assertion of differential treatment cannot support a claim of hostile work environment. *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

Finally, Plaintiff claims that, although Ms. Hurt was "terrible to everyone," she "did not target whites for negative performance actions as she had done with Mr. [W.] and [Plaintiff]" (Pl.'s Opp. 26). C.W. was an African-American technician who Plaintiff alleges Ms. Hurt plotted to get rid of by ordering his supervisor, Douglas Lewis, to make his job so difficult that he would quit. (Lewis Dep. 156-57, ECF No. 47, Ex. 14 – Paper Only – SEALED). Plaintiff's claim that Ms. Hurt only treated African-American employees in this manner is completely belied by her own statements and evidence. In the very same section of her opposition, she claims that Ms. Hurt tried to "get rid of" D.C., who is white, and cites to her internal EEO complaint. In the complaint, Plaintiff alleges that "[Ms. Hurt] discussed how she was going to get rid of [D.C], which is the same method she used to get rid of me and similar to her instructions to Doug on how to get rid of [C.W.]" (Pl.'s Draft EEO Complaint, Linton 09532, ECF No. 40-8, Ex. 11 – SEALED).

## 2. Severity and Pervasiveness

Plaintiff announces, without argument or citation to any legal authority, that she has met her burden of demonstrating severe or pervasive harassment simply by alleging "repeated rudeness, regular and numerous physical actions, verbal threats and negative employment actions" within a one-year period. (Pl.'s Opp. 39). To determine if alleged conduct is sufficiently severe or pervasive to merit relief under Title VII, the Court must evaluate "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (internal quotation marks and citation omitted).

Applying this standard, the Court finds that Plaintiff has failed to show that the conduct she alleges was severe or pervasive.

First, it is well-settled that behavior that is merely rude or callous is not actionable under Title VII. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008); *see also Bonner v. Payless Shoe Source*, 139 F.3d 887 (Table) (4th Cir. 1998) ("Title VII was not intended to eliminate every instance of vulgarity, rudeness, or insensitivity."). All of Plaintiff's allegations regarding Ms. Hurt's "condescending" or "belittling" behavior, such as her tone of voice, facial expressions, and mannerisms, clearly fall into this category.

Second, Ms. Hurt's alleged "race based" comments, cited above, are by no means severe, and appear to have been made in relatively isolated incidents. Receiving comments (on single occasions) concerning one's appearance, or the qualities of one's children, even if crude, ignorant, and based on inaccurate assumptions about race, are not what Title VII seeks to redress. Rather, the sort of verbal harassment that Title VII is concerned with involves "a steady barrage of opprobrious racial comments." *Patterson v. County of Fairfax*, 215 F.3d 1320 at *4 (table) (4th Cir. 2000) (unpublished) (internal quotation marks and citation omitted). Examples of language that courts in this circuit have found to constitute severe racial harassment include: a supervisor's repeatedly calling black employees "boy, jigaboo, n____r, porch monkey… and Zulu warrior," a supervisor's statement that he "did not appreciate [a black employee's] 'taking our white women,'" referring to black female employees as "black hookers," *White v. BFI Waste Services, LLC*, 375 F.3d 288, 297 (4th Cir. 2004), and a supervisor's constantly calling a black employee "monkey, dumb monkey, and n____r," and leaving a picture of a monkey for him to find that was "captioned… with X's and O's, along with the notation 'so you'll never forget who

you are,'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182, 185 (4th Cir. 2001). Ms. Hurt's alleged observations about makeup and family traits do not meet this standard.

Lastly, the Court also does not find that Ms. Hurt's alleged "physical" conduct was severe or pervasive. Occasional acts of frustration or anger, such as snatching papers from an employee's hands, pointing, or banging on a table are, at least to some extent, part of the ordinary tribulations of many workplaces. To be actionable under Title VII, therefore, a plaintiff must demonstrate other conditions, such as pervasiveness, showing that such actions crossed the line between normal workplace skirmishes and genuine hostilities. Plaintiff, however, is uncertain how often Ms. Hurt engaged in these behaviors, but concedes that they did not occur at every meeting. (Linton Dep. 176-84). At most, then, a reasonable jury could conclude that Ms. Hurt sometimes treated Plaintiff in a way that was somewhat physically intimidating or threatening. Although this behavior, as Plaintiff describes it, would certainly be stressful, infuriating, and sometimes embarrassing for any employee, the Court finds that it falls short of what is required to invoke the protection of Title VII.

### 3. Conclusion

Because Plaintiff has failed to demonstrate that her treatment while in Defendant's employ was a reaction to her race or that it was severe or pervasive she has failed to state a *prima facie* case of hostile work environment.[5] Defendant is therefore entitled to summary judgment on this claim.

### C. Retaliation

Plaintiff claims that Ms. Hurt retaliated against her for complaining to Glenn Gealy and for filing a complaint with Defendant's EEO Office. To state a *prima facie* case of retaliation,

---

[5] In view of this finding, it is unnecessary for the Court to decide whether the conduct Plaintiff alleges is attributable to Defendant.

Plaintiff must show: (1) that she engaged in an activity protected by Title VII; (2) that Defendant took an adverse employment action against her; and (3) that a causal connection exists between (1) and (2). *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). When a plaintiff seeks to prove retaliation through circumstantial evidence, the *McDonnell-Douglas* burden-shifting analysis applies.

Plaintiff alleges two instances of retaliation. First, she claims that she engaged in a protected activity when she complained to Glenn Gealy on May 28, 2008 regarding what she believed was racial discrimination by Ms. Hurt, and that there was a causal connection between this activity and Defendant's decision to split the projects and put her on the 45 Day Challenge. (Pl.'s Opp. 46-47). Second, she claims that she engaged in a protected activity when she filed an internal EEO complaint of race discrimination and that there was a causal connection between this activity and Defendant's decision to have Mr. Gealy counsel her about her alleged contact with program sponsors and negative comments about the program. *Id* at 47.

The Court has already determined, in the context of Plaintiff's disparate treatment claim, that these were not adverse employment actions and that Defendant has proffered legitimate reasons for each action, which Plaintiff has failed to rebut. Defendant is therefore entitled to summary judgment on this claim.[6]

---

[6]    Defendant argues that Plaintiff's retaliation claim must be dismissed because the charge that she filed with HCOHR does not mention retaliation. The Court addresses this argument here because, although the point is moot in view of the Court's ultimate ruling, the issue goes to the Court's jurisdiction and should therefore be resolved before entering judgment on the merits.

"A Title VII plaintiff can... exhaust [her] administrative remedies if a reasonable investigation of her administrative charge would have uncovered the factual allegations set forth in formal litigation." *Chacko v. Patuxent* Institution, 429 F.3d 505, 512 (4th Cir. 2005). Plaintiff's charge of discrimination alludes to both Ms. Hurt's alleged racial harassment and the splitting of CREW/JCREW. A reasonable investigation of this claim, therefore, should have revealed that Plaintiff also complained to Glenn Gealy about Ms. Hurt's conduct and that Gealy told Ms. Hurt about Plaintiff's complaint. Since these are the core factual allegations in Plaintiff's first alleged instance of retaliation, the Court finds that she has exhausted her administrative remedies as to that claim. The facts of the second alleged instance, on the other hand, did not occur until after Plaintiff had filed her charge. However, a plaintiff may raise a claim of retaliation for the first time in federal court if the conduct alleged is "like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case

## IV.   CONCLUSION

Accordingly, an order shall issue GRANTING Defendant's Motion for Summary Judgment (ECF No. 37) and CLOSING this case.

Dated this 28th day of September, 2011

BY THE COURT:

_____

James K. Bredar
United States District Judge

---

before the Commission." *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (internal quotation marks omitted). The Court finds that Plaintiff's claim of retaliation is related to and grows out of the allegations contained in her charge. It was those same allegations that prompted her to file the internal EEO complaint, which she claims as her protected activity that caused Defendant to retaliate against her. Thus, there is a clear causal chain connecting the allegations in the charge and the new claim of retaliation. Plaintiff, therefore, has exhausted her administrative remedies with regard to this claim as well.